**STORCH AMINI & MUNVES PC**
2 Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Telephone: (212) 490-4100
Bijan Amini, Esq.
Avery Samet, Esq.
*Special Counsel for Lori Lapin Jones, as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
| | |
|---|---|
| In re: : | Chapter 11 |
| : | |
| PENINSULA HOSPITAL CENTER, et al., : | Case No. 11-47056 (ESS) |
| : | Case No. 11-47985 (ESS) |
| : | (Jointly Administered) |
| Debtors. : | |
------------------------------------------------------------------------x
| | |
|---|---|
| LORI LAPIN JONES, Chapter 11 Trustee of the Estates of : | |
| Peninsula Hospital Center and Peninsula General : | |
| Nursing Home Corp., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| ROBERT LEVINE : | |
| : | |
| Defendant. : | |
------------------------------------------------------------------------x

## COMPLAINT

Lori Lapin Jones, as the Chapter 11 trustee (the "Trustee") of Peninsula Hospital Center and Peninsula General Nursing Home Corp. (the "Debtors), by her attorneys, Storch Amini & Munves PC, for her complaint, alleges as follows:

### Jurisdiction and Venue

1.       The United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 because this

1

action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code"). The Bankruptcy Court has jurisdiction over any additional portions of this matter not covered by the above pursuant to 28 U.S.C. § 1367.

2.  This adversary proceeding contains core and non-core causes of action as defined in 28 U.S.C. § 157(b)(2). To the extent any portions of this complaint are non-core, the Bankruptcy Court may hear the claims and issue findings of fact and conclusions of law and the Trustee consents to the Bankruptcy Court issuing a final order.

3.  Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this action arises in or relates to a case under the Bankruptcy Code that is pending before the Bankruptcy Court.[1]

## The Parties

### The Plaintiff

4.  Plaintiff Lori Lapin Jones is the Chapter 11 trustee for the Debtors' estates.

### The Defendant

5.  Defendant Robert Levine resides at 36 Halyard Road, North Woodmere, New York 11581.

### I. Background

A. The Debtors

6.  The Debtors are New York not-for-profit corporations.

---

[1] Substantially all of the facts herein relate to the period prior to the Trustee's appointment and were derived through the Trustee's investigation.

7. Peninsula Hospital Center ("PHC") was established in 1908 and was certified to operate 173 hospital beds. In addition to inpatient, surgical and emergency room services, PHC provided coma recovery and traumatic brain injury programs, occupational, physical, speech and vocational rehabilitation therapy programs and acute renal dialysis. Prior to its closing, PHC employed over 700 people.

8. Peninsula General Nursing Home Corp. ("PGN") is a skilled nursing facility consisting of a 200 bed long-term care and rehabilitation center.

9. On August 16, 2011, an involuntary bankruptcy petition was filed against PHC. On September 19, 2011, PHC consented to entry of the order for relief and on the same day, PGN filed a voluntary bankruptcy petition (as to both the consent and the petition, the "Consent/Petition"). On September 21, 2011, the Bankruptcy Court entered an order for relief in PHC's case.

B. Levine's Employment as the CEO of the Debtors

10. Levine served as the chief executive officer and president of the Debtors from 1996 through September 20, 2011.

11. During the events discussed herein, Levine was employed by the Debtors pursuant to a January 2007 employment agreement between Levine and PHC which, among other provisions, provided for his salary and benefits and for his duties and responsibilities as set forth in the Debtors' by-laws. Those duties included:

- The duty to assure compliance with all applicable statutory and regulatory requirements, and to institute appropriate corrective action when necessary with effective ongoing monitoring to assure compliance is achieved.

- The duty to organize the administrative functions of the Hospital, delegate duties and establish a formal means of accountability on the part of subordinates.

- The duty to coordinate all phases of the Hospital's professional and business activities, maintain all required or appropriate records, and control and maintain the effective utilization of the physical plant and resources of the Hospital.

- The duty to engage in continuous planning for the improvement of the Hospital and submission of recommendations in connection therewith to the Board of Directors.

- The duty to prepare an annual budget of expected receipts and expenditures and in line therewith and within the stated financial limitations, to select, employ, control and discharge all employees, including salaried physicians.

- The duty to supervise all business affairs such as the records of financial transactions, collection of accounts and purchase and issue of supplies to the end that all funds due the Hospital and collected are expended to the best possible advantage.

## II. Levine Abdicated His Duties to Manage the Debtors

### A. The Debtors' Affiliation with the MediSys Network

12. In 2008, the Debtors sought a partner with which to affiliate. Among other things, the prospective termination of an affiliation with North Shore Long Island Jewish Health System had left PHC with the need for anesthesiology services.

13. On September 29, 2008, PHC entered into a Services Agreement with TJH Medical Services, PC ("TJH") for TJH to be the exclusive provider of anesthesiology services to patients at PHC. TJH is a physician group associated with MediSys (defined below).

14. In early 2009, PHC entered into an Affiliation Agreement with MediSys Health Network, Inc. ("MediSys") a corporation overseeing a network of affiliated hospitals, nursing homes and other medical related businesses, which at the time included The Jamaica Hospital,

Flushing Hospital and Medical Center, and Brookdale Hospital Medical Center (collectively, the "MediSys Network"). Pursuant to the Affiliation Agreement, the Debtors agreed to amend their by-laws to designate MediSys as the sole corporate member of both Debtors. The by-law amendments made clear that, without receiving approval from the New York State Department of Health ("DOH"), MediSys was not becoming an "active parent" for the Debtors and did not alter Levine's duties and responsibilities.

15.  At the time, Levine knew that the United States Department of Justice was investigating David Rosen, the chief executive officer of the MediSys Network, for bribing New York State senators and assemblymen. Though foreseeable at the time, Levine did not undertake any investigation into how the case against Rosen and an indictment or conviction would affect the MediSys Network's ability to affiliate with the Debtors.

16.  Shortly after the affiliation with the MediSys Network, Levine stepped back from managing the Debtors for their own benefits.

B. Levine Abdicates His Duties In Favor of MediSys

17.  The Affiliation Agreement provided that the Debtors would otherwise continue as separate entities under their existing governance structure and provided that the Debtors would consult with MediSys with respect to major corporate and management decisions. At all times during the MediSys affiliation, the Debtors' officers retained fiduciary duties only to the Debtors and not to any other entity. MediSys' affiliation with the Debtors was expected to result in increased efficiency, enhanced management and greater financial stability for the Debtors.

18.  Instead, MediSys, with Levine's acquiescence, immediately embarked on a program to integrate the Debtors into the MediSys Network. Levine stepped back from managing the Debtors independently.

19. Levine reduced his meetings with department heads and reduced his participation in weekly finance meetings.

20. Levine transferred control over the Debtors' finances to MediSys Network executives, and Levine also abdicated responsibility over critical functions of the Debtors, most significantly the PHC laboratory as discussed below.

21. By way of example, an executive not employed by the Debtors and working out of Flushing Hospital made decisions concerning which vendors of the Debtors would be paid, when and how much. To issue checks, MediSys would make the disbursement decision, physically print the check, bring it to Levine for signature and then take it back from him to decide whether and when to mail it out. In addition, executives at MediSys would call clerks in the Debtors' accounting department and authorize book entries to the intercompany accounts.

22. Levine also relinquished substantial control over the Debtors' financial records, including the computer systems governing the Debtors' general ledger, accounts payable, purchasing, inventory control, time attendance, billing and collection functions. Levine caused the Debtors to migrate their financial data systems to MediSys' proprietary software located on MediSys' servers, accessible only over the internet by the Debtors, and completely under MediSys' control. Levine failed to insist upon or otherwise obtain any commitment by MediSys to return the data or ensure access by the Debtors at all times. Thus, when MediSys abruptly withdrew from the Debtors, the Debtors were left without any of their crucial financial records, and ultimately were forced to pay MediSys $5,000 a week just to access their own records. As referenced below, the DOH specifically cited PHC's lack of access to its own financial data systems as a reason to bar the admission of new patients and transfer out all current patients in August 2011.

23. Levine also authorized the transfer of PHC's patient billing and collection functions to FRR Recovery, Inc. ("FRR"), a stand-alone, for-profit entity, affiliated with the MediSys Network. The head of FRR, Vita Fredericks, reported directly to the chief financial officer of MediSys. In addition, MediSys reports that FRR is one of several organizations that provide compensation directly to MediSys' senior executives. Moreover, even though Levine had essentially duplicated the Debtors' internal billing department by outsourcing the billing to FRR, Levine failed to make concomitant personnel reductions at the Debtors. Finally, at a time when the Debtors were unable to make regular payments to critical creditors, Levine caused the Debtors to purchase new furniture for Vita Fredericks, including a conference table and leather chairs.

24. FRR was less effective in collecting receivables than the Debtors' internal staff and existing outside collection agency had been, only adding to the Debtors' poor financial condition. Thus, after these functions returned to PHC (once the affiliation with MediSys ceased in late 2011), PHC's collections on patient billing improved.

25. Levine also caused the Debtors to waste their resources on the costly and unnecessary replacement of their timekeeper/payroll system. Prior to joining the MediSys Network, the Debtors employed a fully automated payroll system that kept track of employee time by having employees scan their palms when they clocked in and out of work. Levine admitted that he did not know of any previous problems with the Debtors' system. Nevertheless, after joining MediSys, Levine caused the Debtors, at their own expense, to rip out the old palm-scanning timekeeper system and install a finger scanning system employed by MediSys. The new system provided no additional meaningful benefit to the Debtors.

26. Levine operated the Debtors in a manner that put the interests of the MediSys Network over the best interests of the Debtors. For example, Levine caused PGN to override its regular acceptance policies in order to accept numerous uninsured residents who were not eligible for Medicare/ Medicaid. As a result, PGN was deprived of over $1.5 million in revenue and had to pay for the costs of care for the uninsured residents.

27. By way of another example, Levine caused the Debtors to employ the parking management company used by the MediSys Network, Welcome Parking LLC, even though Welcome Parking would costs tens of thousands more a year over the next competitor.

28. Levine failed to monitor and verify the intercompany accounts between the Debtors and the MediSys Network. Over the course of their two and half year affiliation, the Debtors and the MediSys Network amassed millions of dollars in intercompany debits and credits. Levine undertook no meaningful efforts to ensure the monitoring of these accounts.

29. Instead, Levine told the Debtors' staff that they did not need to worry about the intercompany accounts because the Debtors were part of the MediSys team and it would not make any difference who owed what to who. At his Bankruptcy Rule 2004 examination, Levine testified that he needed to "remind" the Debtors' chief financial officer, Mark Skulnick, that the Debtors "were no longer independent, and if others wanted to tell him what to do, especially those in authority [MediSys], they had the right to do that." As far as Levine was concerned, the Debtors and MediSys were all part of the same organization.

30. Levine failed to retain independent legal counsel to assist and protect the Debtors in their dealings with MediSys. Instead, Levine relied on the assistance of MediSys' counsel and retained them to represent the Debtors. Thus, the Debtors had no independent legal counsel who could advise against the transactions involving the MediSys Network and the Debtors.

31. Levine failed to develop a restructuring plan to deal with the Debtors' deteriorating financial condition and failed to develop a plan to deal with the foreseeable contingency that MediSys would terminate its relationship with the Debtors.

C. Levine's Personal Feud With the CFO Left a Void Over the Debtors' Finances

32. Adding to Levine's abdication of responsibility for running the Debtors was the personal feud that developed between Levine and the Debtors' chief financial officer, Mark Skulnick, the second most senior executive of the Debtors. This infighting further exasperated the lack of controls and oversight by the Debtors' management over critical functions.

33. Levine and Skulnick had vastly differing perspectives on who, if anyone, at the Debtors had responsibility for financial matters. Thus, while Levine testified that he considered Skulnick the liaison between the Debtors and MediSys, Skulnick claimed that Levine refused to even disclose the terms of the contract with MediSys, and that he served no such purpose. Levine testified that Skulnick reported to him that patient accounting was improving after transferring it to FRR, the MediSys affiliate. Skulnick testified that he was forced "practically with a gun to my head" to transfer those functions to the MediSys Network for a higher fee and much lower performance.

34. In March 2011, Skulnick resigned his position with the Debtors. Skulnick was then replaced with MediSys' director of finance on a part-time basis, completing the abdication of all financial matters concerning the Debtors to MediSys.

D. Levine's Abdication of His Duties Concerning PHC's Laboratory

35. Levine also abdicated his duties to keep the PHC laboratory in compliance with DOH regulations. DOH's order to close the laboratory also led to the closure of PHC

36. During the spring and summer of 2010, Allen Corby, PHC's Vice-President of Operations, repeatedly warned Levine about serious financial and personnel issues at the PHC laboratory. In August 2010, Corby warned Levine that in his "professional opinion it is imperative to act on this now before the issue reaches a point I am convinced will result in harm to the institution and patient." Levine failed to undertake any meaningful action to remedy the problems with the PHC laboratory.

37. Nevertheless, by that point, Levine had, unbeknownst to the board of directors, abdicated most of his responsibility to run PHC. Because of the dysfunctional nature of the relationship between the Debtors' top executives, as well as Levine's misunderstanding of the relationship between the Debtors and MediSys, many functions, including specifically oversight of the PHC laboratory, were not being adequately addressed.

38. On October 5, 2010, the DOH issued a Laboratory Evaluation Report based upon its August 31, 2010 survey of the PHC laboratory. The Laboratory Evaluation Report cited the PHC laboratory with thirty-three (33) violations of DOH's standards of practice, including:

- Discrepancies on test results between patient reports and lab instrument printouts
- Lack of supervision and supervisory review
- Failure to monitor the temperature of the room storing sensitive chemicals
- Failure to maintain laboratory equipment, such as microscopes, blood bank timers and cell washers
- Failure to test reagents and using expired reagents
- Lack of inventory control for supplies
- Failure to maintain proper testing procedures

39. Pursuant to Section 405.3 of the New York Code of Rules and Regulations ("NYCRR"), the daily management and operational affairs of a hospital "shall be the responsibility of the chief executive officer." The same section enumerates specific duties and responsibilities of a hospital chief executive.

40. The very first duty is (a) "The chief executive officer shall be responsible for the development, submission and implementation of all plans to correct operational deficiencies identified by regulatory agencies on a timely basis and shall report to the governing body progress in developing and carrying out plans of correction."

41. As chief executive officer of PHC, Levine was responsible for familiarizing himself with any deficiency reports, taking steps to correct them and reporting to the DOH any progress on carrying those plans out.

42. Nevertheless, despite repeated internal requests to correct the deficiencies with the PHC laboratory, Levine failed to take necessary steps to correct those deficiencies and failed to allocate necessary resources to allow others to do so. In fact, Allen Corby needed to threaten to quit to compel Levine to even have a telephone conversation with the DOH concerning the deficiencies with the PHC laboratory. Levine failed to recognize, understand or appreciate the gravity of the problems with the PHC laboratory.

43. On February 23, 2012, the DOH issued an order for summary action suspending the permit for PHC's laboratory (the "Lab Suspension") as a result of serious deficiencies in the administration and operation of the PHC laboratory. On the same date, the DOH issued a second order (the "Suspension and Diversion Order") stating that "the continued operation of [PHC] without the services of its clinical laboratory poses a danger to the health of current and future patients of [PHC]." (both orders, the "DOH Orders"). The DOH Orders required that (a) ambulances be diverted from PHC, (b) PHC immediately cease admitting new patients, (c) PHC immediately develop a plan to transfer out all current patients, (d) PHC cancel all surgeries and procedures and (e) PHC immediately suspend all general activities dependent on PHC's laboratory.

E. <u>The Initial Closure of PHC and the Chaos in August 2011</u>

44. In 2009 and 2010, PHC had operating losses of over $20 million. In 2009, PHC experienced an unrestricted net deficit of over $18 million, with an operating margin of negative 24.3 percent and in 2010 PHC experienced a greater deficit of $28 million, with a margin of negative 22.4 percent.

45. In March 2011, the United States Department of Justice indicted the chief executive officer of the MediSys Network, David Rosen, for bribery of New York State legislators. Rosen, who had been MediSys' chief executive officer for many years, was relieved of his duties at the MediSys Network.

46. Shortly thereafter, in April 2011, MediSys engaged a financial advisor to examine ways of restructuring the MediSys Network given the financial challenges that the MediSys Network was then experiencing. The initial engagement referenced the necessity for assessing whether PHC was "mission critical" and was a candidate for "divestiture."

47. In or about late July 2011, MediSys made a presentation to PHC's boards of directors that PHC had no choice but to close and immediately begin preparing a plan of closure. This prompted, on or about July 27, 2011, the PHC board to submit a closure plan to the DOH.

48. On August 9, 2011, the PHC board wrote to the DOH rescinding the closure plan and informed MediSys that PHC wished to remain open as a functioning hospital.

49. On or about August 11, 2011, MediSys hand-delivered a letter to the PHC board announcing the termination of affiliation and provision of shared services, including the services then being provided by the MediSys Network's anesthesiology group, effective August 22, 2011.

50. As a result of MediSys' unilateral termination and PHC's financial condition, by letter dated August 19, 2011, the DOH put PHC on ambulance diversion, prohibited PHC from

admitting walk-in patients to the emergency room, and barred PHC from accepting transfers from other facilities.

51. By letter dated August 22, 2011, the DOH wrote to Levine stating that the DOH had not received an operation plan outlining the actions that PHC would take to

> assure availability of staff and supplies and replace the services lost with the withdrawal of MediSys (including but not limited to computer services that govern general ledger, accounts payable, purchasing, inventory control, time attendance and billing and collection, etc.)

Absent receipt of such a plan, the DOH ordered PHC to stay on ambulance diversion, prohibited PHC from admitting walk-in patients to its emergency room, barred PHC from receiving patient transfers from other facilities and ordered PHC to transfer and discharge each remaining patient by 4:00 p.m. on August 23, 2011.

F. Levine Failed to Protect the Debtors When MediSys Abruptly Withdrew

52. As discussed above, Levine abdicated the management of the Debtors to the MediSys Network, considered the Debtors to be part of the MediSys Network team and took no steps to protect the Debtors from the MediSys Network in the event the parties came into conflict.

53. As set forth above, by letter dated August 11, 2011, MediSys informed Peninsula that, effective at 5:00 PM on August 22, 2011, MediSys was 1) withdrawing as the corporate member of the Debtors and 2) terminating the provisions of administrative or shared services to the Debtors. These services included the provision of anesthesiology, without which PHC could not function as a hospital. In addition, the letter demanded the immediate payment of "all amounts due for services provided by MediSys and its affiliates," an amount that MediSys claimed exceeded $6 million.

54. Levine took no steps to enforce the terms of the Debtors' affiliation agreement with MediSys which provided that "[t]the term of this Agreement shall be for ten (10) years," and did not provide for any early unilateral termination by MediSys.

55. Levine also did not take any steps to enforce the terms of PHC's contract with MediSys' anesthesiology group. That contract specifically provided that neither party could terminate the agreement without cause on less than 120 days prior notice or, if one party failed to perform any material obligations, "and such default shall continue for a period of thirty (30) days after written notice thereof has been given by the other party, the party serving such notice may terminate this Agreement on ten (10) days' further written notice." Without anesthesiology services, PHC had no ability to function as a true hospital.

56. Levine was terminated by the Debtors on September 20, 2011. Two months later, Levine obtained a position with the MediSys Network as the executive vice president and chief operating officer of Flushing Hospital and Medical Center.

## CLAIMS

### FIRST CLAIM FOR RELIEF

**Breach of Fiduciary Duty of Care**

57. Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

58. Levine, as the chief executive officer of the Debtors, was required to discharge the duties of his office with the care that an ordinarily prudent person in a like position would exercise under similar circumstances.

59. By committing the acts and omissions set forth above, Levine breached his duty of care owed to the Debtors. Those acts included, *inter alia*,

- Abdicating the management of the Debtors to the MediSys Network;
- Taking actions beneficial to MediSys and not in the Debtors' best interests;
- Relinquishing control over the Debtors' financial operations and financial documents to the MediSys Network;
- Failing to address critical deficiencies at PHC's laboratory as mandated by the DOH and Levine's employment contract; and
- Failing to protect the Debtors when MediSys abruptly withdrew.

60. As a direct and proximate cause of Levine's breach of the duty of care, the Debtors have suffered damages in an amount to be proven at trial, but believed to be at least several million dollars consisting of, *inter alia*, costs associated with the abrupt shutdown of PHC in August 2011 as a result of the MediSys termination, the closure of the PHC laboratory and the waste generated following the affiliation with MediSys, including the deterioration in the Debtors' finances and the drop in patient billing and collection.

## SECOND CLAIM FOR RELIEF

### Breach of Fiduciary Duty of Loyalty

61. Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

62. An officer of a corporation must act with the utmost loyalty to and in the best interest of the corporation.

63. While he served as chief executive officer of the Debtors, Levine owed an undivided duty of loyalty to the Debtors.

64. Levine breached his duty of loyalty to the Debtors by committing the acts and omissions set forth herein, including, *inter alia*,

- Abdicating the management of the Debtors to the MediSys Network;
- Taking actions beneficial to MediSys and not in the Debtors' best interests;
- Relinquishing control over the Debtors' financial operations and financial documents to the MediSys Network;

- Failing to address critical deficiencies at PHC's laboratory as mandated by the DOH and Levine's employment contract; and
- Failing to protect the Debtors when MediSys abruptly withdrew.

65. As a direct and proximate cause of Levine's breach of the duty of loyalty, the Debtors have suffered damages in an amount to be proven at trial, but believed to be at least several million dollars consisting of, *inter alia*, costs associated with the abrupt shutdown of PHC in August 2011 as a result of the MediSys termination, the closure of the PHC laboratory and the waste generated following the affiliation with MediSys, including the deterioration in the Debtors' finances and the drop in patient billing and collection.

## THIRD CLAIM FOR RELIEF

### Breach of Contract

66. Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

67. Levine had an employment agreement to serve as chief executive officer of the Debtors with specified particular duties as enumerated above.

68. Levine breached those duties by, *inter alia*:

- Abdicating the management of the Debtors to the MediSys Network;
- Taking actions beneficial to MediSys and not in the Debtors' best interests;
- Relinquishing control over the Debtors' financial operations and financial documents to the MediSys Network;
- Failing to address critical deficiencies at PHC's laboratory as mandated by the DOH and Levine's employment contract; and
- Failing to protect the Debtors when MediSys abruptly withdrew.

69. As a direct and proximate cause of Levine's breach of his employment agreement, the Debtors have suffered damages in an amount to be proven at trial, but believed to be at least several million dollars consisting of, *inter alia*, costs associated with the abrupt shutdown of

PHC in August 2011 as a result of the MediSys termination, the closure of the PHC laboratory and the waste generated following the affiliation with MediSys, including the deterioration in the Debtors' finances and the drop in patient billing and collection.

## FOURTH CLAIM FOR RELIEF

### Objection to Claims Filed By Levine Against the Debtors

70. Plaintiff realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

71. The Trustee objects to the claims asserted by Levine against the Debtors, based on, *inter alia*:

- the claims are not entitled to administrative expense priority;
- the claims are not valid against PGN;
- Levine breached the employment agreement;
- the Debtors' estates are entitled to a setoff against Levine's claims as a result of the claims asserted by the Trustee herein; and
- the claims are subject to equitable subordination.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in the Trustee's favor against the defendant on each claim set forth herein, in the amount requested or relief sought for each claim, and including, where applicable, attorneys' fees and costs and pre-judgment interest, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 18, 2013

By: _____

**STORCH AMINI & MUNVES PC**
Special Counsel to Lori Lapin Jones, as Chapter 11 Trustee

Bijan Amini, Esq.
Avery Samet, Esq.
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 490-4100
Fax: (212) 490-4208